May it please the court, a jury acquitted Lacey Sivak of premeditated murder, but convicted him of felony murder in 1981. What do we derive, what can or must we derive from the equivalent count one, was it? No, count one I believe was robbery, I think it's robbery. I thought you said count one, count two. It was the premeditated murder count. What do we derive from that? I believe you necessarily must derive that the jury found that Sivak was the actual killer, that it's not a matter of a lack of malice or that we don't know whether it was express or implied malice as the state argues in the brief. Frankly, we know the jury found malice because they convicted him of felony murder and therefore the acquittal has nothing to do with malice. It has to do with whether it was willful, deliberate, or premeditated. Okay, so I'm just going to be specific. What is, what can we say that the acquittal on that count concludes? I believe you can say that given the facts of the case and it's not a statutory argument based upon the aggravators themselves, that the jury considered and decided that the government did not prove that Sivak premeditated and specifically with respect to this case more than that, that he was not the actual killer. He didn't have the intent to kill. He may not have done it at all, but certainly the government didn't prove its case and that's why they convicted of felony murder and not premeditated. Let me just tell you, the language was intentional, deliberate, and premeditated, right? Willful, deliberate, and premeditated. Willful, deliberate, and premeditated. And so the acquittal of that, as a logical matter, we would say they did not find that all three of these existed or they must have found that one of those was absent. Maybe more than one, but at least one. Yes, and the most, I think under the facts of the case and the arguments and the instructions, that willful and deliberate is the question. I mean, the best argument for why this might not have a double jeopardy effect is what Judge Windmill said, that maybe they got premeditation wrong. But when you look at the fact that the defense argued nothing about a lack of premeditation, their defense and argument at closing was Seebeck didn't do it. You know, he was along for the ride, the other guy did it. The prosecution argued that Seebeck did it and that he necessarily premeditated and correctly argued under Idaho law that you cannot shoot five times, switch to a knife, stab 27, some 22, I think, more times, and in fact, under the facts of the case, the knife was broken, switch blade, go to a second knife, and then also sexually molest the victim. I mean, that was the entirety of the argument, I think, under Askey-Swenson, when you have to look with rationalism and realism at the circumstances of the case and the jury's verdict that under those specific facts, and I think it's a narrow case on the facts, they necessarily found in order to find the lack of premeditation in that, under those circumstances, that the government had not proved that Seebeck did it and they acquitted him of that. Counsel, I hear what you're saying in terms of what was said by the prosecution, but in Paulin v. Arizona, the Supreme Court made clear that if there are multiple aggravating factors and only one of the factors was errantly implied, it doesn't vitiate it. And in this case, the trial judge, as I understand it, found four separate aggravating factors beyond a reasonable doubt. One of them is excluded, if you take your argument, about the willfulness. But he also found that the murder was especially heinous, atrocious, cruel, manifesting exceptional depravity. He also found that by the murder or circumstances surrounding his commission, a defendant exhibited utter disregard for human life. And finally, the defendant, both by prior conduct and conduct in the commission of the murder at hand, has exhibited a propensity to commit murder, which will probably constitute a continuing threat to society. Is there anything in what the jury did that addresses any of those three additional factors? Absolutely. If you look carefully, and it's quite clear, at the judge's written findings in this case, sentence, his actual killer finding that overrode the jury's verdict is in every one of those other aggravators. For example, on the hack aggravator, it's not enough that he found it was heinous, atrocious, and cruel. He went on to explicitly state that this murder, where the defendant actually stabbed 20 times and shot five times and so on, while sexually molesting the victim, he found that as part of the aggravator. He used it. He did the same thing in the propensity and the utter disregard aggravators. If you look at his findings, he says, on utter disregard, no one could have killed her in this manner and had any regard for her life. He's taking the fact that he believes Sivak personally himself killed her to find that aggravator. Your argument hinges on our looking at the acquittal on count two as a finding by the jury that he did not personally do it. Yes, it does. That there quitted him of being the hands-on murderer as opposed to being the accomplice, who would have the same, the guy who stands by can be just as guilty as the guy who actually sits there and wields a knife, but you're saying the jury must have found, acquitted him of being the one who has done it. That's what you want to derive from, that's what you must derive from the acquittal on count two in order to answer Judge Smith's question about the additional aggravators. That's correct. I guess I'm still stuck on understanding why the jury couldn't have acquitted him of count two by saying it's not premeditated. I mean, he gets the store, the gas station, convenience store, the location he intended to rob, and there on the spur of the moment decides to kill her. He stabs her many times, shoots her, does those things, but there's no premeditation. Why couldn't the jury have acquitted him of that, thinking, well, we can't really agree whether he was premeditated or not, so we'll acquit him of that because we're going to get him on felony murder anyway, and in any event, the reason we find him not to be guilty of count two is lack of premeditation. Why isn't that the most logical? Because nobody presented that theory to them? Because the prosecutor explicitly said premeditation is necessarily here when you stab 20 times, shoot five? Juries are notoriously independent in this country, and I'm sure in Idaho as much as in any state in the country, they tend to be pretty independent, and the juries don't always take what the lawyers proffer to them. They may take some from one or some from the other, and they may have seen it differently from either the prosecution or the defense. Well, you would have to accept that, and you would have to accept that they ignored the arguments about what premeditation is, and you would have to accept that, you know, maybe an error of law and they decided it incorrectly. I mean, I think it's the Rumsey case out of Arizona. You could do that. I mean, the theory is that between the time he does the first stabbing and the time he gets done with the last bullet, and fondling her, you know, whatever he did, that at some point along the way he must have developed a plan, you know, developed a state of mind for premeditation, and the jury might have looked at the same situation and said, no, he's sort of there, he doesn't intend to kill her, and then he starts stabbing her, and he gets caught up in the frenzy of the thing, and she won't die, you know, she's struggling, and so he's now sort of stuck feeling like if I don't kill her, she's going to identify me, and so, you know, he doesn't, never forms a plan. Why couldn't the jury come to that conclusion and say, well, you know, so fine, you know, we, in the American system, he gets the benefit of the doubt, so we'll acquit him of that. We're just not sure of premeditation, not sure beyond a reasonable doubt, but we do get him under felony murder. Why couldn't the jury rationally do that? Why isn't that the likely thing the jury did? It's extremely unlikely. There's no evidence of any kind in this case to support that post hoc sort of reverse impeachment of the jury's verdict. Whose burden is it at this point in the litigation to, if you will, divine what the jury had in mind? I think it's, I'll take that burden. Okay. I mean, it seems to me, you know, within the limits of Aspie Swenson, you know, that we must look at this here today as this jury rationally and realistically looked at it. If there had been an argument. But to the chief judge's point, though, I assume you would agree that rational people on a jury could, I'm not saying they did, but they could parse the evidence in the way that the chief judge indicated. Where they might say, look, he was angry about being fired. He went over there. He was going to scare her. He was going to do whatever. And that was premeditation. But, you know, and then all of a sudden passion took over. He was reminded that he had been fired and he just flew off the handle. Something like that. Isn't that a rational conclusion that the jury could have come to? No. Regardless of what the lawyer said. I would say no, because there's no evidence to support that theory. The evidence is, see that guy up there? Chris, you're speaking of a vacuum of evidence. I'm talking about if you accept the burden, don't you have the burden to show that they didn't do that? I think I have a burden to show that it's not rational or realistic to believe that they did that. Is that a legal standard that we have to follow here? I think it is. I think that's what Aspie Swenson said. How do we really know what they did, absent a special verdict form and an instruction on premeditation? I think we know that because nobody presented this theory, the road you're trying to go down to escape, so to speak. No, that's not what I wrote. The district court said it was a likely road. And that's what we're reviewing. I beg your pardon? The district court basically concluded that was what likely happened. I don't even know. I can't recall if he said likely. He did conclude it was a possibility that the jury was misinformed and made up some other reason, you know, essentially, to get out of it. I think if you're going to start thinking in those terms, then we ought to be able to talk about cases where, you know, a judge erroneously finds an aggravator under the wrong legal standard. That still has a double jeopardy effect. I mean, to the extent maybe you want to disagree here today about the significance of it, it seems to me that necessarily. Well, it is significant. The question is, does it have a collateral estoppel effect? Is it specific enough? And Judge Winmelt concluded no, that there were alternative theories under which the jury might have found that there was specific intent or that it didn't preclude the finding of specific intent because he could have formed the specific intent at the time, just even moments before committing the murder. But I gather your argument is it's possible. You don't think it's plausible given the theories that were presented at trial. That's correct. It's not plausible. It's not realistic. It was never presented that there was a lack of premeditation by anybody. The prosecutor made it quite clear. He necessarily had it. And the defense made it quite clear. He didn't do it at all. Perhaps we're, you know, I've said what I have to say about this one. Unless there's more questions on this point, I would move on. Do you want us to take the road less traveled? Well, I like Robert Frost, but in what way? Well, I'm just saying that there are many different approaches. You want us to take the one that you argue that other judges chose not to take and where you've agreed that you have the burden. I am here seeking reversal of the district court, Your Honor. And you're not making a separate argument about the client that he can't get the death penalty because he was acquitted of premeditation. No. Under Idaho law, they can give felony murder convictions that can receive the death penalty. Under federal constitutional law? Yes, there are cases under federal constitutional law where felony murder has been upheld. Oh, yes, there have been. But in Shiro, they left the verdict form on first-degree murder, non-felony first-degree murder blank. So the Supreme Court there said, well, they could have found premeditation even while finding felony murder. Here we have a case where you have an actual acquittal on the first-degree murder. So we must at least derive from that the fact that the jury acquitted him of at least premeditation, maybe more, but at least premeditation. And I was just asking whether, because I don't think I saw it presented, but I just want to make sure you're not presenting an argument saying that somebody who's acquitted of premeditation may not constitutionally under federal constitution be given the death penalty. You know, I'd like to make that argument. I think there are cases that have allowed it in this industrial. You're not making that argument? I am not. Okay. Let me turn to the biased test claim. In this case, Judge Newhouse thought that this case was all done. In 2006, he stated that after he was sentenced in 1981, he thought it was all done, that he was never reversed, that he considered the various reversals ridiculous and silly. He had become fixed in his mind and considered the various sentencing proceedings a waste of time, at which he had to reaffirm what he decided. Under the facts of this case, Judge Newhouse was actually biased. He was predisposed to an outcome. He was engaged in a long-running bitter controversy with both counsel and the appellate courts, and his emotional and resentful and angry feelings toward counsel and the courts carried over to the point where he had a stake in the outcome. He had deep-seated antagonism against Mr. Sivak himself, and he had numerous extrajudicial influences, which he failed to disclose despite a court order. All of these factors are ways of finding actual bias and are present in this case. Before which sentencing do you claim that he had actual bias? Perhaps in the very first one, because of the calls and letters from the public. Well, he referenced them generically. Yes. Is there any evidence that adds to the content, or except for that reference, anything was developed? There's just the general statements. He suggested that they would have been attached to the pre-sentence report. Right. And so forth, and the calls would have been shunted to the pre-sentence investigator. The letters are not attached to the pre-sentence report. And, of course, his clerk suggested otherwise in her deposition as far as not screening his calls in the manner that he referred. Well, that's more of a Gardner claim I'm talking about. Where do you claim actual bias? Give me the time frame, if you don't mind. Well, there's several places. Certainly, by 1984, when counsel quite reasonably wishes to inquire about that, since the newspaper article was clear, as you just said, as far as counsel knew, he received calls and letters from the public before sentencing. I think we'd all agree it wouldn't be unreasonable to inquire and wonder what the scope of that contact was. And when counsel sought to find out about it, Judge Newhouse figuratively threw his hands up in the air and called it a Roman circus, objected, and so on and so forth, and declined to elaborate in any way, and the Idaho Supreme Court reversed him. Not on that ground, but with respect to mitigation that he had refused to hear in the 1983 resentencing. Can I just ask for clarification? I'm not trying to detract in any way from your answer, Judge Thomas, but within that context, can you address whether you are arguing that the bias that you claim rises to the level of a Caperton issue or any of the three prongs of Caperton? In other words, does it rise to a constitutional level? His bias rises to a constitutional level under the due process clause for actual bias. I think we could make an implied bias under the facts of our case and under Caperton, but I'm arguing we have more. Frankly, when the Idaho Supreme Court sent this case back, they instructed Judge Newhouse explicitly to disclose the contacts. They said clear the air completely and state on the record the factual contact of the calls and letters. As a reminder to the trial bench of this state, they put it in the same opinion. If any factual information reaches judges of the state of Idaho that touches on their sentencing decision, let the judges of this state know that they have at least an obligation to disclose that back to the defendant to avoid even the appearance of impropriety. Well, Judge Newhouse took that opinion and the instruction to disclose on the record and issued the on the record statement, which I'm sure you're familiar in the record, where he went on a personal rant, suggested that counsel was fabricating innuendo, called it a carnival atmosphere, objected to his integrity being questioned. But in March of 1987, he disclosed in response to the Idaho Supreme Court's opinion that he hadn't listened to those calls and letters and he suggested that he had no bias and he hadn't heard any of them. Within a month, more or less, of that time, Michael Sivak, the father of the defendant, walked into his chambers and had an ex parte conversation with the judge in which he said The day of the conversation? Pardon? The day of the conversation, yeah. We know from Lori Fulton's deposition that it was April of 1987 that the father called her and bragged about it. So I don't have a precise date for you as to the timing. I mean, I would hope for Judge Newhouse's sake that it was in the six weeks after his on the record statement and not before it. I think it probably was, but I really, I don't know that. So to summarize, your actual bias claim really goes to the 1992 resentencing? Absolutely. I mean, it's the last sentencing that matters. It's only the last sentencing that matters. And the fact of the matter is that over 10 years, if he wasn't in 81, he certainly was by the end. How do we know that Sivak is not lying? Because Judge Newhouse admitted he was not lying. He said in his deposition, Michael Sivak came into my office and told me, why don't you kill the son of a bitch? And he said, oh my God, that's your son. In this case, I can't talk to you. His further response, and maybe the most important one for our purposes here today, is that his next sentence was, go talk to the prosecutor. He chose sides. He went to the other side. He absolutely refused to comply with the Idaho Supreme Court's mandate. And he never disclosed it to the defense. If any one of you were sitting at the trial judge at that time, your reaction would probably be something along the lines of this. Whoa. That was an unusual conversation. Let me get counsel in here and tell them about it. I think I can compartmentalize it. Maybe I can set it aside. But you certainly have a right to know about it. So what's your best evidence on this record that he had actual bias against Mr. Sivak? Well, certainly. We know he was angry with the Idaho Supreme Court. We know he was frustrated with the system and he was mad at the defense counsel. What's your best evidence on the record that he was anonymous and went to your client? Well, the fact that he would choose sides and tell Mr. Sivak to go seek out the prosecutor, he's going from a neutral side to the prosecution side, in a sense, with that. If the guy comes in and says, here, I want you to execute a guy or condemn him to death, it's just that sending him to the prosecutor is consistent with what the father said to him. And why would he send him to the defense? You say, look, I can't talk to you about it, but if you want to present it, what you got to do is go through one of the lawyers. And the lawyer likely to present this for you is the prosecutor. I don't see anything biased or wrong with that. Well, isn't it what we have to deal with here, though? I mean, just from my own perspective, I mean, I think he made a number of intemperate statements and perhaps didn't do everything that one would have hoped for. But the question I have is, did what he did rise to the level that it taints the whole sentencing proceeding? I think it absolutely does. I mean, you've got to read his deposition thoroughly and look at the many, many places in which he said, this case was all over in 1981. I felt no compunction about listening to whatever ex-party contacts, including not just Michael Seebeck saying, kill my son, but an oil representative calling in and saying, kill my son, and believing and hearing gossip. Basically, what you're suggesting is that a judge in a relatively small town can't try a murder case. No, I'm not suggesting that. I'm suggesting that when the Idaho Supreme Court commands you to disclose ex-party contacts of the nature that Judge Newhouse received in this case, there is a reason for the disobedience and the declining to do so, and that is actual bias. Isn't that the matter for the state courts to sort out? If the Idaho Supreme Court wasn't happy with the trial judge's response, it could have done something about it. They didn't know. These facts are not before the Idaho Supreme Court. We got them in a deposition in 2006 in the Hades case. Have you done anything since that time in terms of bringing this to the attention of the Idaho Supreme Court? No, we have proceeded with our Hades case. Was there anything that precluded you from going back to the Idaho Supreme Court and saying, hey, you ordered the trial judge to do this? We just found out he didn't. I mean, it should have been pretty obvious that he didn't because he, in fact, didn't disclose anything at the time. But is there some reason that when you found out about it, you didn't go complaining back to the Idaho Supreme Court saying, you have an order out there, we just found out the trial judge didn't comply with your order, we want you to? We didn't need to. Well, he's retired now anyway, isn't he? He's in Las Vegas. I'm not saying punish the judge. They might or might not, that's a different question. But if you think this prejudice is your case, if the Idaho Supreme Court orders a remedy that's supposed to benefit your client, and you find out the trial judge does not comply, why isn't the place to go and complain about it is back to the court that ordered the remedy and say, okay, now we're in this situation, the judges are tired, send aside the death sentence because of bias. You could make that request. Because in Habeas, we don't have to do that once the claim is exhausted and further facts are properly developed. We can talk about whether you had to do it or not. I'm asking whether you could have done it. Is there anything that precludes you from doing that? Well, the Idaho courts routinely refuse to entertain such claims. I'm sorry, a claim that they ordered a trial judge to do something and it comes out that the trial judge didn't comply with their order and the Idaho Supreme Court has said we're not going to entertain this claim because it's too late? I have a hard time believing there's such a case. No, no, no. I meant just in terms of successful petitions. And within 42 days, I suppose, I could have done that. There's a very specific circumstance here where the trial judge is ordered by his state highest court to do something that would have a bearing on the sentence. I mean, let's say he disclosed facts that revealed all manner of expired contacts. That might have really had a significant bearing on it. He doesn't do it. And now you found out years later that, in fact, he says he hasn't done it. You've got proof. Why wouldn't this be the kind of thing that you'd take up with a state court? Well, I guess, frankly, because this is a pre-epic case where these facts can be found in this court and the court below. And they necessarily rose to the level of judicial bias. When the case had gone on for 20 years, they had assorted procedural defaults or problems every time we came back, including on the Brady issue, when a NAPI claim was clearly raised. And under the law, these facts are properly cognizable in federal court. But, in effect, I guess what we seem to be collectively saying is, you have raised what you believe to be very strong evidence of bias on the part of the judge. But the Idaho courts, either it wasn't raised with them or they didn't do anything about it. The trial judge in this case, a very well-regarded judge, I'm sure you know, felt that it didn't rise to the level that you contend. Now you're asking us to say that it does rise to the level it contends. I have the greatest respect for Judge Windmill. But he made a very serious mistake. He evaluated the ex parte context only in connection with the Gardner claim. And he gave no weight of any kind. He didn't mention it in evaluating the judicial bias claim. You know, that's a very important fact. I mean, it's great to have so many different kinds of bias flowing through this case. You know, the long-running controversy, the seeking of vindicating his position with the court of appeals, not wanting another remand or reversal, but to disobey and hide matters that bear on sentencing to such a degree as the ex parte context in this case from Michael Sivak and the oil company representative and the comments about Mr. Sivak's mother. It seems to me that that nondisclosure in the timeframe that we're talking about, it couldn't merely be overlooked and forgotten as the state suggests. It has to rise to something much more active than that. But I don't think you ultimately answered Judge Thomas's question, and that had to do with the framework. This was sent back a couple of times. So at the time of the last resentencing, so I suppose it would have been the third sentencing, all of these things had occurred before. Can you tie, is there anything about what happened before that you can bring forward to the date of the last sentencing? I mean, presumably by that point, the trial judge was significantly chastised, if you will. He may not have been happy about it, but he certainly had been reversed before. He knew that the Court of Appeals, any number of Court of Appeals, were going to be looking at what he did. I say to the last sentencing, what evidence can you point to that shows at that point that he had not been able to purge his feelings and whatever and move forward in a businesslike manner? How about the Fazio statement about co-defendant Bainbridge admitting that he had fondled the victim, pulled her shirt up and fondled her at the time of the attack? Judge Newhouse issued a finding in 1981 that SEDAC did it while sexually molesting the victim. And that statement was suppressed by the state along with other stuff by the people we know to be lying prosecutors. And that evidence came out and was argued at resentencing. Did it change that finding? No. I contend he was fixed. He wasn't going to do it over, never a reversal, not going to do a resentence. It was all done in 1981, and I think that's evidence of it. I think... What is it that you think was the cause of the bias? I mean, if he is convinced by the facts of the case that your client deserves a death penalty because it's such a heinous crime and all that, that's not bias. It's the opposite of that bias. I mean, bias would be, for example, it doesn't happen in this case. In this case, it turns out they were neighbors and the defendant at one time had his dog around his property or something, or they had a long-running family fight or something like that. But there was nothing like that going on, right? I mean, whatever view the judge had about the case, all derived from facts in the courtroom. Well, is that really bias? I mean, he was quite firm about what he thought that the defendant deserved a death penalty, but it was all shaped by evidence presented in court, right? No. Okay. No, because he was told by an oil company representative out of court to kill Mr. Stevak, and was told by the father of the defendant. Right, but he'd already imposed a death sentence prior to that. The fact that somebody calls and says something like that may or may not have any influence, but I don't see any evidence on the record that he relied on that. And granted, you're unlikely to find it, but I'm not sure how much it adds to the case in terms of bias. I mean, particularly if you're talking about a relatively small town, it's somewhat unavoidable to have some stray comments come being directed to the judge in his or her daily life. These are not just the occasional stray comment from the street. We haven't even talked about them. There were numerous ones like that with the legislature, the court, and people in the street, and he was quite open and willing to engage in that too. But I don't think it's fair to lump in kill the defendant comments or the defendant's sexual relationship with his mother as ordinary run-of-the-mill stuff that could be disregarded. And frankly, it couldn't be disregarded. It was mandated to be disclosed. And I think a judge was so sensitive as to say, I was never reversed. So when the case came back to him five times, so defensive about it, in such a fight with both counsel and the courts to call it a Roman circus, a carnival atmosphere, to suggest that counsel is fabricating things. And then in order to, you know, minimize the likelihood perhaps of yet another proceeding and reversal, he decides, I'm not going to tell anybody about this stuff. I mean, the judge has taken a side to defend his verdict. He's all about vindicating himself and his prior findings, and he's required to be open and listening. And it said it was all done in 1981, and he said so himself. Okay. Thank you. We'll hear from the states. Thank you, Chief Judge Kaczynski. May it please the Court. Because of the number of claims today, I have three primary goals. Number one, and most importantly, is to answer any of the Court's questions regarding any of the issues of the claims that have been raised. Number two, and perhaps just as important, is to correct a portion of my brief on the standard that must be applied to state court findings of fact. And I'd like to address that very quickly. Counsel is correct that I misstated in my brief that the defense, that the petitioner has a burden of establishing state court findings are erroneous by clear and convincing evidence. That is the post-ADEPA standard. And I filed supplemental authority explaining the difference between the post- and the pre-ADEPA standard. And my brief, candidly, was wrong on that, and I apologize to the Court and counsel for that. I know the standard does, so go ahead. Okay. And, of course, I'm happy to address the double jeopardy argument very quickly, and I will address the bias claim, but I would like to spend a few minutes, if I have time, on the Brady claims and the DePauw claims. As far as the double jeopardy claim, Judge Smith, I think you're absolutely correct, and Judge Kaczynski, for that matter. As far as, yes, there was an acquittal on the premeditation charge. The problem was there was no instruction on what constitutes premeditation. In the petitioner's brief, they correctly cite the standard for what is premeditation in Idaho, but that standard wasn't given to the jury. And if you look at the way that the case tried this, the state tried this case, they tried to establish that premeditation on the part of Seebeck commenced basically at the time that he was fired. That was their allegation of motives, is that Dixie Wilson caused him to be fired, and he was very upset by that. There was a lot of evidence regarding that. And it extended to the point where he went and stole a gun from the shop where his mother worked, that he ultimately had to, he didn't have to, but he ultimately conceded, admitted to stealing that gun, along with the ammunition that was associated with this case. And then he developed a ruse as far as working with Bainbridge on the van so that he can have an alibi. Now, that was basically the state's theory of premeditation. And the jury was perfectly inclined to reject that theory. Yes, counsel is correct that in Idaho, premeditation could have been established based upon the simple firing of five shots into Dixie Wilson's body and the 22 stab wounds, the changing of the weapons. But the jury was never so instructed. You're, in effect, I gather, relying on Poland versus Arizona and its progeny to indicate that you don't have double jeopardy if there are multiple aspects and the aspects not covered by the jury findings arguably are free and clear of the double jeopardy taint. That is absolutely correct, Judge Smith. On top of that... What does that mean concretely in this case? Concretely means that because there is another alternative to the jury finding a lack of premeditation, that Lacey Siedek was still the killer. And another thing that we know from the jury's... I'm not sure what you just said. And I apologize then, Your Honor, that the allegation as I understand it, the claim that Siedek is raising, is that as to what we call the felony murder with specific intent aggravator, Judge Newhouse was not permitted to find that aggravator because there was allegedly a finding by the jury that he wasn't the actual shooter, the actual killer, the actual stabber. And there are other alternatives to that. So what do we derive from the acquittal on count two? What is it that we must derive from that? Simply that he was not guilty of premeditated murder. And that's all that can be derived from that. Okay, so anything that flows from lack that requires premeditation from that point on, he is acquitted of, right? I'm sorry, Your Honor. I didn't understand. So premeditation is out of the picture, right? Yes, Your Honor. Any aggravator that involves premeditation would be precluded. Yes, Your Honor. I don't know how we get around that particular verdict. But that doesn't mean he wasn't the stabber, the killer, the shooter. And we know that, particularly with regard to the shooting. Right, but then how do you explain Judge Newhouse's finding that he planned committing serious crimes? The robbery, Your Honor. Well, there's no jury finding of that. He was convicted of robbery. There was a jury verdict on the robbery, which leads me to my next point. And that is Lacey Siebeck was also charged with sentencing enhancements based upon the use of a firearm during the commission of the felony. Specifically the robbery, I believe it was the robbery and the murder. And the jury found him guilty of having possession of the firearm, at least as to the robbery. So I think for Siebeck to come into court and say that verdict alone, meaning the premeditation verdict, establishes he wasn't the shooter. No. Because the jury actually found that he possessed the gun, at least during the course of the robbery. And there's no evidence that the gun was transferred from Lacey to Bainbridge other than I don't even think Lacey testified to that. Did anyone raise the theory at trial? I don't think so, but it's been a while since I've looked at it, that this was an attempt formed just prior to the killing? There is some discussion in the prosecutor's closing argument, I believe it's one paragraph. And I can't tell you, and I apologize, I don't recall the executive record page number. So basically that's it. That wasn't the primary theory, as you can see. That's not my recollection. But it really is the primary theory of sentencing, isn't it? Absolutely. Well, it has to be, because to address, I believe it was Judge Kaczynski's question, my recollection of Supreme Court precedent is that you cannot impose the death penalty based only on felony murder. You have to have felony murder with the intent to kill. And so the death penalty could not have been imposed in this case, absent a specific finding by Judge Newhouse. I believe he did make that finding in his findings. Can you have an intent to kill without having premeditation? Absolutely, Your Honor. In fact, if you look at Idaho law, second degree murder. I was going to say, that's the essence of second degree murder, is it not? That is the essence. But I think the point I was curious about is this, is that it's a little unusual for a sentencing judge to use as a primary theory, one that wasn't advanced at trial, argued at trial, litigated at trial. But that really does form the basis of the capital sentence. I'm not saying he necessarily could have done that, but it's a bit unusual. I'm not going to disagree that it is a bit unusual at all. I can't. But how do we... Go ahead. Can you have a death sentence for second degree murder? No, you cannot, Judge Kaczynski. Well, at least in Idaho. And I don't believe even under the... It's not a federal constitutional law. I'm trying to think. Can you have a death penalty with felony murder coupled with the intent necessary to do second degree murder? You combine those two. I believe you can, because... That's really what we've got here. At least that's your argument, right? Yes, Your Honor. I mean, even whether it be Idaho or federal constitutional law, well, let's talk about Idaho. The intent to kill, whether it be second or first degree murder, is the same. It simply gives you intent to kill this individual. Right. So how do we know, given the instructions, that Judge Newhouse didn't, in fact, sentence on the basis of felony murder alone? The intent required to commit felony murder? I believe, Your Honor, throughout his findings... In fact, I believe that's their argument, that Judge Newhouse's findings permeate... Let me rephrase that. Judge Newhouse's finding that Lacey Siebeck was the killer, the shooter, permeate his findings. And, in fact, they do. I don't believe that's their actual claim. I think if you look at their habeas petition, that they were actually making this challenge. It's only one of the statutory aggravating factors. But Judge Newhouse made the finding that Lacey Siebeck was, in fact, the killer in this case. Did the jury make that finding? I know you indicated the jury found that he committed robbery, that he had the gun. Did they find that he was the killer, either directly or indirectly? I struggle, based upon the verdict forms and the instructions, to say, yes, they did. When you have a jury trial, they're the finders of fact, right? Yes, Your Honor. And the essence of the whole point, as the defense counsel has made this point, is that if he didn't commit the murder, we got the wrong guy, as far as any death penalty is concerned. And yet the jury made no such finding here. It was the judge that made the finding. Is that permissible under Idaho law? It was prior to Ring. Now, based upon Ring, we now have to have a judicial finding, of course. And Ring isn't an issue. And Ring's not retroactive. Correct, Your Honor. Yes, that's correct, Your Honor. So under Idaho law, as it existed at the time, and federal constitutional law, as it existed at the time, it was permissible for the jury to make no finding about who actually committed the murder and for the trial judge to make that finding. Is that correct? Your Honor, the reason I'm hesitating is because I'm not sure that I can definitively state that there was I don't recall that there was a statute that said that the jury could do that. I don't believe, I have to kind of argue it in the reverse. There wasn't anything that prohibited the judge from making that specific finding. He certainly impliedly did that, of course. But you can understand why this is rather important. Obviously, if somebody didn't find who was authorized to do so, that Mr. Sivak was the killer, then we've got a real problem here. Even putting aside the second, I mean the double jeopardy issue. So we put that to the side. I'm interested in whether the trial judge or the jury, which I think you've indicated the jury has not made such a finding, did the trial judge have the right under Idaho law and under federal constitutional law as it then existed to find what the jury did not find, i.e. that Mr. Sivak was the killer? My recollection of federal constitutional law is that nothing prohibited the trial judge from making that finding nor required the jury to make the finding. And Idaho law is silent about it? I really am struggling to recall that because I've been dealing with a new statute for so long. My recollection, though, is that Idaho law, it would be codified under my recollection as 1925-15 as it existed prior to that time, and my recollection is that there is a provision within that statute that permits the judge to make that finding. What troubles me is obviously the state bears the burden to show beyond a reasonable doubt that somebody committed the crime, certainly one of this heinous nature. The jury, again putting aside the double jeopardy argument, does not make that finding. So if the judge makes the finding, and it's kind of in a roundabout way explaining the nature of what was done but doesn't explicitly state, I find that Mr. Sivak committed the murder under the constitutional level of evidence, don't we have a problem there? Well, Your Honor, I believe that the trial judge did make an express finding. In fact, on page 208... Did he state that he so found beyond a reasonable doubt? No, Your Honor, he did not. Did he have to? It is an important finding. Does he have to find... Certainly post ring he would be required to. Right, I understand that. But I mean, we're dealing with a world as it then existed. Did he have to make his finding beyond a reasonable doubt or can we imply that? And if so, on what authority? I'm struggling here because I... Well, I don't know how we get around not making that finding beyond a reasonable doubt, even pre ring. Is that fatal to your case? Your Honor, I don't believe it is because, number one, it's not raised as a claim. Okay, so you're suggesting that we deal with this on a waiver basis in effect? Well, I don't think... I don't believe that new claims can be raised, number one, for the first time on appeal and number two... Even one that's important as to whether the defendant committed the murder? No, I don't believe so, Your Honor. I mean, there's not even been an argument presented that I'm aware of that there was some kind of constitutional violation based upon Judge... I'm not even talking about constitutional. I'm just saying I'm deeply troubled by the fact that no trier of fact in this case seems to have determined that Mr. Sivak murdered this woman. The trial judge, by implication, did with those three felony murder type factors. And I understand he clearly thought that was the case. But that he made no such finding himself in the absence of a jury finding seems rather odd to me and troubling to me. So I'm hoping you're going to be able to help me with that issue. And, Your Honor, I wish I could help you more. But the only thing that I can rely upon are the findings. And I don't recall Judge Newhouse expressly stating that I find Lacey Sivak committed this crime beyond a reasonable doubt. And, in fact, I'm perusing the findings right now. I'm not sure that the burden that was required to be shown by the state was ever addressed in the findings anywhere by Judge Newhouse's findings. Isn't that, with respect, isn't that elementary under our system of law that the state bears the burden on any criminal prosecution, let alone a capital case, to prove beyond a reasonable doubt that the defendant committed the crime? Unquestionably. It's elementary. And, you know, I don't want to put findings into Judge Newhouse's findings, but it may have been so elementary to Judge Newhouse that he simply did not include that phrase, beyond a reasonable doubt. He did on the aggravators, but he didn't find it on specific intent. I mean, he doesn't say he found beyond a reasonable doubt that the defendant committed the crime. He finds beyond a reasonable doubt that he participated. So we get back to the felony murder. And, Your Honor, thank you for bringing that up because he does mention beyond a reasonable doubt on page 210 of the excerpts as far as the statutory aggravating factors. And under paragraph A, he talks about what we call the hack aggravator, the heinous atrocious accrual, and says the defendant actively participated in continually stabbing the victim. Well, then maybe that doesn't mean he participated in stabbing. And so you're saying there was such a finding. Your Honor, now, again, I was looking and couldn't find it. I believe that is a finding beyond a reasonable doubt that he, at a minimum, participated. Now, Judge Newhouse doesn't go so far as to say how far, but not only stabbing her, but shooting her. Well, in the aggravators, you know, if he made the earlier finding, then the aggravators make a whole lot more sense. Yes. But he doesn't make the earlier findings beyond a reasonable doubt whether or not that's material at this stage. I don't know. Let me ask you this. I think we've talked about some of the possible interpretations of the jury verdict. And I gather you concede that it's possible that the jury actually acquitted him and found that he didn't do the killing based on the verdict. I have to concede that's a possibility, yes, Your Honor. But I think it was raised during counsel's argument. It's his burden to establish that there aren't other possibilities under Poland and its progeny. And there is clearly other possibilities. I say clearly, at least in my mind. And I believe the record establishes that, particularly since there wasn't an instruction on the question of premeditation. You don't think that the equivalent count to his finding includes a finding of wilfulness? Not necessarily, Your Honor. No, not at all. The verdict itself says that he's not guilty of premeditated murder as it was charged in count two. There are a number of elements. The verdict says. He used the phrase in typical. Here we go. Do you have the verdict? I do, Your Honor. It's on page 1583 of the excerpts. And if you'd like to, I can read it. We, the jury in the above entitled case, find the defendant not guilty. And above that it says murder in the first degree, count two. Count two is the premeditation count. That's all it says. Okay. And what were the instructions as to what count two required? I'm afraid I didn't bring the instructions with me, but I know certainly premeditation was required. There was a discussion of. What do we derive from that quote on count two? What is it that they must have found was absent or not proved beyond a reasonable doubt? I would submit that it's premeditation, Your Honor. Why not willfulness too? I don't know that there can be a finding on willfulness. I suppose it's possible. Well, why can't the jury find that willfulness was not proved beyond a reasonable doubt? Theoretically it's possible. If that's what they were asked to find in order to find him guilty on count two and their acquittal. So it gets down to the question of what were they instructed to ask the count to? It is, Your Honor, possible. And it's possible, as Judge Thomas mentioned, that they actually did intend to acquit him of being the actual shooter, the actual killer. That's a possibility based exclusively upon the jury verdict itself. Following up on the Chief's comments, there actually is more language, at least as I understand it, in the jury verdict. It's not only willfully but unlawfully, deliberately. And then it goes on to premeditation. So if you isolate those, if the jury found him not guilty of unlawfully committing the murder, what does that say? And, Your Honor, I have found, I did bring the instructions with me and I apologize. I'm not sure what it says as far as unlawfully. I can't envision a scenario in this case where it wasn't established that it was done unlawfully. What were the instructions? Your Honor, 1598 of the excerpts is the instruction on what murder is. It does talk about murder as the unlawful killing of a human being with malice of forethought. And then it talks about what malice, that malice can be either plied or expressed or implied. And that instruction goes on to talk about all murder which is perpetrated in any kind of willful, deliberate and premeditated killing is murder of the first degree. Right. And so the premeditation is required for the first degree killing. And then, of course, all other murders are. Well, it says willful, deliberate and premeditated. So when they find that that, when they acquit him of that, why isn't it a finding of not willful, not deliberate and not premeditated? Well, Your Honor, I don't know that without a special verdict form that we can ascertain that it isn't or that it is. We simply don't know. All we know is that he was acquitted of first, of premeditated murder. And that certainly it's possible that they found that it wasn't willful, deliberate. How big a burden is it to show what they found? At this point in time, it's the petitioner's burden. Even though the state has the burden to convict someone beyond a reasonable doubt. Yes, Your Honor. So that's interesting. So you're saying that if the jury finds that there's no willfulness involved. And by definition, even in second degree murder, there's volition involved, if not premeditation. I would think that the jury's finding would be entitled to at least a common sense reading of the language, right? And that's certainly what Poland and its progeny state. Right. And if we get past the issue of what the jury found, then I'm right with you on the Poland and the aggravators and so on. But I'm following up on the Chief's comment here. I mean, the reality is if volition is involved and the jury found that it was not volitional, how do you get around that? I mean, second degree murder is volitional. Even voluntary manslaughter is volitional. So what credence do you have to give? What is the jury verdict worth if you just isolate the word premeditated? Well, I don't know that it's so much an isolation of the word premeditated as much as it is just relying upon Poland and its progeny that there are some other explanations. Yeah, but basically what you're saying is that the state gets the benefit of the doubt to construe a jury verdict in the way that is most pleasing to the state. When, in fact, it's the burden of the government to convict beyond a reasonable doubt. Isn't the burden really the other way around? Not at this stage of the proceedings, Your Honor. Not based upon Poland and I believe it was Shryo. That burden is upon the petitioner at this stage, and I readily accept the burden. Shryo doesn't help you because in Shryo they left blank the form as to first degree murder. And they convicted him of felony murder and the Supreme Court there said, well, this doesn't preclude the findings necessary for first degree murder. They simply could have gotten there through felony murder. There's nothing they did that precludes them having found malice, premeditation, so on, from the felony murder. But in this case there is. There is an actual verdict acquitting him. And just to convince you, I understand your point that factually Shryo is distinguishable because the jury verdict was left blank. But I don't know that it's a distinction that makes a significant difference in this case because when you look at the law that derived from Poland and Shryo, that is based upon the verdict that we have, which is the acquittal on count two, is there an explanation for the jury's verdict that would result in a double jeopardy claim not surviving? And I didn't say that very well and I apologize. But as I understand the claim, the claim is based upon the jury verdict that says we acquit him of premeditated murder and that establishes that he wasn't the killer, that verdict alone. I don't think you can derive that from this verdict. Well, we're almost out of time and we're going to talk about the Brady and the Pukla issues and maybe about judicial bias. Maybe we should move on to that. I'd be happy to, Your Honor, and because time is short, I don't want to spend it. You must admit that the prosecutor here didn't cover himself in glory. That's an understatement, Your Honor. Neither did the investigator. This was not one of Idaho's most shining moments. Was the prosecutor disciplined by the bar? No, Your Honor. This information didn't come to light, as mentioned in the briefing. And the information, Your Honor, I want to make sure I'm clear. I'm assuming you're talking the four letters. Well, the four letters, letting the witness testify to what was at least questionable, perhaps no only false testimony. No, Your Honor. Was the prosecutor still practicing law and order? Honestly, I don't know. He's not a prosecutor anymore. My understanding is that he's a semi-retired civil plaintiff's attorney. And as far as you know, the state bar hasn't taken any action against him based on his conduct in this case. I am unaware of any action having been taken in this case. He doesn't hold political office. I'm sorry? He doesn't hold political office. No, Your Honor. Well, I don't think it's as bad as what happened in Hayes, but it's pretty close. It's not a good scenario, and we candidly admit that. He... I don't know what more I can say. Factually, it's abysmal. Counsel doesn't... We had our conversation before about what the jury said. And normally, I would be probably disposed to cut you some slack on it. But when you add to that the argument of defense counsel about this judge, and the way he handled this, the obvious peak. I'm sure nobody likes to be reversed and so on. But you add the... And on a cumulative basis, Brady, who... The fact that the killer was not expressly found, although there seems to be this finding of participating in the killing. Doesn't that cumulative effect tend to weaken the state's argument in terms of the double jeopardy issue? In terms of the double jeopardy issue? Let me rephrase that. Weaken the argument in terms of the state's bearing its burden to show who committed the murder. In other words, it was the judge that found that, basically. It wasn't the jury that found that. That's what I'm saying. You've got a judge who is allegedly biased. You've got a prosecutor who didn't reveal a lie. You've got issues that were not disclosed, arguably, under Brady and so on. And you have a harmless error analysis. But here, how harmless was it when you had... Basically, you've got all this giant apparatus that the state brought to bear against an individual. And doesn't that hurt the state in its case? Your Honor, I don't know that it has any direct effect on the double jeopardy claim. I understand that counsel, in their reply brief, raised a cumulative error argument. And let me back up for just a moment. I understand that the Brady errors have to be reviewed, the Fazio statement. And the layers have to be viewed cumulatively. And eventually, the Napoo, alleged Napoo violation has to be factored into that. I understand that. But as far as the other claims, there was no cumulative error argument that was ever raised until the reply brief. Are we barred from considering cumulative error? Even in isolation, these things don't make much difference. But when you have the judge making the finding of who committed the murder, the jury not doing that, and some ambiguity as to what the jury meant, can we raise the cumulative error sui sponte? I'm not aware of authority that stands for that proposition. In fact, my understanding of the authority is just to the contrary. And what authority is that? And I can't cite you a case today, Your Honor. I apologize. I would be happy to supplement. I want to give it a 28-day letter or something like that, if it gives that authority. I would be happy to do that. I will respond to that when I get back. One additional point to be made on the Brady claim. And it does actually tie in with the double jeopardy claim in some respect. And that is on the guilt phase. If the allegation is that there was, now I'm struggling to remember how to, if the allegation on the guilt phase of the Brady claim is based upon he lied, he lied, he lied, meaning Latham, and that it was only Latham's testimony that put the gun in Seevick's hand, and it was only Latham's testimony that put the knife in Seevick's hand, I'm sorry, then the acquittal on the premeditation, if you find that claim, absolutely guts the Brady claim. Well, why does it gut it for sentencing purposes? It wouldn't gut it for sentencing purposes, Your Honor, and you're absolutely correct. But there was additional information that Judge Newhouse had for purposes of sentencing that we've talked about in our brief, including Vaughn Colleen's testimony at that pretrial hearing. Judge Newhouse heard that. The jury didn't hear it. Right. But Judge Newhouse did. Well, let's talk about the letters. Yes, Your Honor. It certainly would have been mighty useful to have those letters. Your Honor, I can't deny that it would have been useful, but I don't believe that there was anything contained within the confines of the letters that weren't known to defense counsel. I struggle with that. It's almost a metaphysical question of what it means to know something. We don't really, in court, act based on knowledge or even upon facts. We act upon evidence. And, you know, something may be, you know, readily true, and the prosecutor might or the plaintiff's lawyer or whoever has a burden might know it, you know, to a moral certainty, but he can't present evidence in court because it's hearsay or, you know, whatever, you know, can't put it in court. It doesn't exist. It's not a fact. And it's one thing to cross-examine a witness and say, aren't you in the play of the prosecution, and make him look like a schmuck and so persuade the, you know, maybe persuade the jury that there must be something going on. It's another thing to pull out a letter from the, you know, and say, hey, look at this. We have evidence that you actually, they dropped these charges. We have evidence that there was a parole board. We have evidence that, I forget, the prosecutor did a couple of other things that are detailed in those letters. And you don't have to guess about this. When you look at this, when you look at him, you can take it as a given that not only did he get favors from the prosecution for his testimony, but he lied to you about it. He sat here and bald-facedly said, I did it out of the goodness of my heart because I have a wife and children out there. And, in fact, here we have it in black and white that he did it because he was trying to save his own skin. It's a different world. I mean, it's a different thing. This is the kind of thing that would have not only impeached this witness, but would have cast aspersions on the honesty of the prosecutor, on the candor of the prosecutor, destroyed the state, the representative of the state's credibility in court, and probably undermined, you know, how it is in court. But, you know, you're selling yourself as much as anything when you're a trial lawyer, right? I mean, if the jury begins to think that the lawyer is a slime, the case comes. It's an unusual thought. I'm sorry? An unusual thought. Well, you're a trial lawyer, I gather. No, Your Honor. I started my career as a trial lawyer. I do strictly appellate work. I do an occasional evidentiary hearing in federal court. But you've done trials. Yes, Your Honor, and I understand what you mean. We're not disagreeing here. All of us have seen trials, done trials, and if you, as the lawyer for the party, lose credibility with the trial fact, with the jury especially, that's it. That's the case. That's the case, because at that point, they will not believe anything you put on. They'll say, well, showing presence of evidence, probably you're leaving something out. And these letters would have been that kind of thing. Your Honor, I understand exactly what you're saying. I mean, the same is true with an appellate lawyer. An appellate lawyer has to maintain some level of credibility before the court also. I understand that. Certainly a trial lawyer in front of a jury. The difference, and I'm not disagreeing with you at all, the difference is not all of these things here that we can dive in, and we're not quite so dependent on a lawyer as a jury is. The jury, you've been on juries, haven't you, as a juror? You know, you really feel, I have. I wish I had. You really feel trapped, and, you know, you sort of want to reach out and say, wait a minute, tell me more, but you can't do that as a jury. You know, you sit there, at least not in courtrooms I've been in as a juror. I actually allow my jurors to ask questions, but not in criminal cases. I haven't done it. Hidden questions. You know, of course, if they have anything to do with this. But it is really, it is, I don't know, I find the letters quite troubling. And I can appreciate that, Judge Kuczynski. I was not happy about the letters either. Particularly when you get them and it's all over, you can't do anything about it. You know, and I don't mean to be demeaning or anything, but, you know, as an appellate lawyer, I'm a pooper scooper, and you have to come along and clean up the crap that's found. I wouldn't even ask you what you think we are. But, you know, seriously, when you're talking about an appeal error, we've said reversal is almost automatic. Assuming that it's not procedurally barred, why isn't this an appeal error? I think it's awfully close on an appeal error. But there is, and I wish I could remember the name of the case that we cited in our brief, and maybe it was a similar case, I've read so many cases that even perjury, and I'm not going to concede that there was perjury in this case. That's pretty close, though. It's darn close, but I'm not going to go there. You know, that's the argument they made to us in Hays, which is, well, he didn't know he was lying and there was all this, but the fact is the prosecutor knew the true score and didn't disclose it to the jury or the judge. Yes, Your Honor. I wouldn't go to say that perjury is okay in a few. Well, we cited the great one argument that even in, at least in the case that we cited, and again, I wish I could remember the name right now, that in that particular case, even the perjury did not undermine confidence in the outcome. Well, that prejudice is a different issue. Yeah. Here you've got an acquittal. You've got judge sentencing. And arguably the judge sentenced on the basis of second-degree murder, not first degree. I mean, he did make the finding. It was in the commission. The robbery intent was formed. It's pretty close to a second-degree murder finding. You've got a lot of problems in this case. I don't doubt that, Your Honor, like I said. But when we talk about the, you know, yeah, sure in a few areas you have to show some degree of prejudice, but this isn't exactly a case where you have overwhelming evidence that would lead you to a capital offense. Oh, I'm not sure I agree with that at all, Your Honor. I mean, if you look at the overall evidence, I guess the question comes down as to who was the killer. This is a capital crime we're here for. We're not here because he's spending time in prison for felony murder. No, and I understand that. But the forensic evidence was basically not even refuted that Lacey Sievek was the killer. And I'm talking specifically about the fingerprints. Yeah. I mean, there's no explanation whatsoever that Wayne Bainbridge's prints weren't on that gun. The only prints on that gun were Sievek's. He's the only one that had them. Is all the evidence basically still available? I mean, the fingerprints, the gun, and all that sort of thing? I have no idea, Your Honor. I truly don't. But referring, or going back to Judge Kaczynski's concerns regarding the letters and particularly Lacey, I think it's very important to note the closing arguments in this case. And Sievek's attorney recognized the effectiveness of his cross-examination in this case. And when you talk about, Judge Kaczynski, the credibility of the prosecutor in this case, Mr. Keeney, who was the defense attorney, really took that on in closing argument when he said, if the state has to stoop that far in order to prove their case, if the case has to stoop to get Mr. Latham cut from underneath the parole violation, three pending felonies, and in Mr. Latham's own words to Kevin Schaefer, out from underneath 40 years of incarceration, and end up releasing him from the jail on the first day he testifies to go prey on the public again, beyond any restraint, it tells you something about their case. And the prosecutor himself noted twice that Latham's testimony wasn't really great. He said, it doesn't bother me or particularly matter to me whether you believe these two less than gentlemen. This is, and there was one other point from Sevek's trial attorney where he specifically discussed, and this is on page 1655 of the excerpts, he'll, referring to the prosecutor, he'll stoop to using inmate witnesses, he'll stoop to turning loose a criminal from 40 years of incarceration. Latham's testimony. But that's far different from saying the prosecutor lied to you. That's powerful. I mean, that's an additional factor that would be pretty powerful. I mean, I take your point with respect to the inmate or the witness. I mean, that's a fair comment, but it's a little bit different when you have the integrity of the prosecutor at stake. It's not your fault, we understand that. And I appreciate that, Your Honor. Unless there are other questions? Okay, thank you. Thank you, Your Honor. We are out of time, Mr. Lewinson, but we'll give you a minute for rebuttal if you choose to take it. Think carefully about whether you want to take it. Well, the first thing I'd like to do is take back my concession, if I may, and cite you to Edmond and Winship as a basis for felony murder not being sufficient for death. I'd also like to address the Napier claim. Do you have a claim like that in this case? What claim? The Napier claim? You might think of it as an abstract legal proposition. Felony murder without a...itself is not enough for death. You have to have some collateral finding of intent, documentation, and that sort. But is that claim raised in this case? Has this been exhausted? Well, I think in terms of the...I think you can get to it in the Double Jeopardy claim, perhaps, with... The answer is no, right? Yes. It's not the kind of thing we can really source-spot it. If it's not raised in this court, if it's not raised before us, if it's not exhausted... I mean, the...I know the Supreme Court did address the claim. It was a little strange. It was sort of in the Double Jeopardy context. Right, and I think you can get to it in the Double Jeopardy context. And when you look at the instruction for premeditated, willful, and deliberate, and the acquittal operates to take those elements away, what's left? I mean, the NAPI claim, any reasonable likelihood that this could have affected the verdict. Certainly... I'm sorry, which verdict would this be?  The jury's verdict? It would be the jury's verdict. Or the judge's...I guess you call it the sentencing decision. The sentencing decision. I think you can get to the sentencing decision as well. I mean, the judge was misled as much as the jury. But then ultimately it all came out, so... Not until after the sentencing, though. No, these letters were not discovered until after 1992. Yeah, that's right. You know, in fact, this judge was making findings, presuming the prosecutor's version to be truthful and correct, on a very close call about the suppression of the Fazio Statement, in ignorance that this prosecutor had already perjured himself three or four years earlier. I mean, he's given the prosecutor the benefit of the doubt in a very close call, with respect to the Fazio Statement, in 1988, when the defense said, we didn't see it. We were looking for this kind of stuff, and we didn't see it. And the prosecutor merely said, well, it would be my general practice to leave it there. He didn't say it was in there. He suggested it probably, usually, normally would be there. And I think to side with the prosecutor in that instance, when the defense is very clear, that stuff was missing, and it wasn't there. And then you find out years later, this guy is willing to disrespect the court, in a very troubling manner. That credibility determination should have been made differently, I think, wasn't a full and fair hearing, and would be, you know, if anyone got a chance to review it today. In light of the fact that he took statements, you know, that go to actual killer-specific, which came out of this snitch witness, and, you know, I think there is a reasonable likelihood, at the very least, that the suppression of this material goes to the sentencing as well. Okay. Thank you, counsel, for a very enlightening argument, and I say both sides were very good and very candid. I appreciate it. We appreciate that. We are case argued, submitted, and we are adjourned. All rise.
judges: Kozinski, Thomas, Smith M.